Smith, et al. *v.* St. Catherine Gravel Co., et al.

March 22, 1954

No. 39107            58 Adv. S. 42            71 So. 2d 221

*Riley & Johnson, L. C. Gwin,* Natchez, for appellants.

*Vardaman S. Dunn,* Jackson, for appellees.

ROBERDS, P. J.

Mrs. Eva W. Smith, as the surviving widow, and Sheila Louise Smith as the minor daughter, filed a claim against appellees under the Workmen's Compensation Law as dependents of Arthur E. Smith, who departed this life December 10, 1950. Decedent had suffered an injury on April 10, 1950, while an employee of appellee Gravel Company. Claimants contended that this accident was the cause of, or at least a substantially contributing cause to, the death of Arthur E. Smith, who v. as not an employee of the Gravel Company at the time of his death. The attorney-referee, the Compensation Commission, and the trial judge found that claimants had failed to establish that the injury was a substantial contributing cause to such death. We are asked to reverse the findings and conclusions of those three tribunals and give judgment here for claimants. The employer and insurance carrier, the appellees, also plead that (1) the claim was not filed with the Commission within the time required by law; and (2) no notice of death was given appellees as required

by law; and (3) the claim resulting from death was not filed within the time required by the statutes. However, the lower tribunals having found there was no causal connection between the accident and the death of Mr. Smith did not pass upon the other questions raised by the appellees. Likewise, we decide only the question whether we shall reverse the findings of fact by said referee, Commission and trial judge.

The attorney-referee made these findings of fact: "(a) On April 10, 1950, the decedent, 56 years of age, fell and fractured his left hip and skinned his left arm. He was seen by Dr. Louis M. Magee of Natchez, Mississippi, and was referred with a splint on his leg to Dr. Donald T. Imrie of Vicksburg, Mississippi.

"(b) Dr. Imrie examined the decedent on April 10, 1950, and was given a history of the fall and fracture. His examination revealed the following: 'He has asthma wheezes and rales in both places which sounded bronchial; the heart sounds were normal; temperature was 102. My impression was that he had chronic alcoholism and the fracture of the left trochanteric region, and the plan was to prepare him for surgery.'

"(c) Decedent had surgery on April 11, 1950, at the hands of Dr. Imrie who testified relative thereto as follows: 'Lateral longitudinal incision was made and a Neufeld nail with a long blade was inserted. X-ray then showed that the blade had gone posterior to the neck. . . . It was then decided to use a Smith-Peterson nail with a McLaughlin extension. The nail was placed, it being possible to use a five-inch vitallium nail because of its being started low. Extension plate was applied and firm fixation accomplished. Check picture showed good position and incision was closed with cotton and spica dressings applied.'

"(d) The decedent remained in the hospital for 24 days following surgery on his hip. In ten or eleven days after surgery, the patient developed a thrombophlebitis of

the left leg. He was discharged from the hospital on May 4, 1950.

"(e) On May 31, 1950, (41 days after the accident) the decedent returned for check-up examination. At this time swelling occurred only about the ankle, and this after dependency and without tenderness or swelling in the rest of the leg. And it was felt by Dr. Imrie that the patient was doing all right from the standpoint of phlebitis. There was no swelling in the right leg.

"Decedent's general condition was quite good; X-ray showed maintenance of position with callus forming; he was given permission to gradually wean himself from crutches and return in six weeks for removal of nail and plate.

"(f) On July 10, 1950, (90 days after the accident) the decedent was seen by Dr. Herring and was referred to Dr. G. H. Martin who testified that he complained of swelling in his right leg for a period of a week previous to this date, which had become worse in the last three days. He gave a history also of developing pain in his right chest with some shortness of breath and had spat up blood on several occasions.

"Examination revealed decedent to have rather marked swelling of right leg and thigh with tenderness over the veins; also fever and redness of the right leg.

"Such condition was diagnosed as phlebothrombosis of the right lower extremity with pulmonary embolism.

"An operation was performed and the vein in the right thigh was exposed and opened and blood clots were sucked out all the way to the pelvis and from the distal vein to his foot. The veins were then tied off to prevent throwing further clots.

"It was testified by Dr. Martin that the decedent recovered from this condition, the wound healed, the lung cleared and the decedent was allowed to go home on July 18, 1950, eight days after the operation. At this time there was some residual swelling in his leg which was considered as usual following ligation for this condition.

"(g) On August 8, 1950, (118 days after accident and 28 days after the last operation) the decedent returned for a check-up examination, and Dr. Imrie found very little swelling in the leg but decedent did have some swelling in the ankle on standing. There was no further pain in the chest.

"(h) On September 11, 1950 (151 days after the accident) decedent was admitted to the hospital for removal of the nail and plate, which was successfully removed. At this time, decedent was having mild edema of both legs but only after dependence. His heart and lungs were negative. He remained in the hospital for eight days.

"(i) On October 11, 1950 (181 days after the accident), the decedent returned for a final check-up. There was no drainage, no pain, but he had mild edema of both lower extremities about the ankles and feet, but only after dependence. X-ray showed good healing. There was some weakness of left side on weight-bearing, but with supervision he could stabilize this. At this time decedent was walking with some limp and was protecting his hip with his crutches. Progress was found to be satisfactory without any additional or further complications. Decedent was encouraged to increase his walking without crutches and return to regular work in a month.

"(j) The decedent did not seek further medical aid. He continued to have some swelling in his lower extremities. He had difficulty in lacing his shoes. He did not completely discard his crutches or return to work. He stayed in bed part of the time. He drove his automobile on occasions. No one ever noticed that he had any symptoms of heart trouble. He was 56 years of age and weighed about 185 pounds and was not a sickly man.

"(k) On December 10, 1950, (8 months after the accident, 5 months after the operation for blood clots, and 2 months after his final discharge) the decedent got in his car and drove from his home onto the highway. When

he had gone a short distance, he was seen to turn his car around and head back toward his home. The car then went over on the shoulder and stopped. When his wife saw this, she went to the car.

"Upon her arrival the decedent did not seem to know anything. He was still breathing but did not speak. His head was kind of lying back. There was slobber from his mouth. He was trying to draw or blow his breath between his lips. His color was natural, but when the ambulance got there and they put him in the ambulance, he turned bluish black. He was not dead when they put him in the ambulance. He was breathing far apart.

"The decedent was dead on arrival at the hospital. He was cyanotic. There was no autopsy.

"In this case, we have two of claimants' doctors stating the view that death from pulmonary embolus was the most likely cause of death. We have two of claimants' doctors who, though generally familiar with the case, did not even hazard a guess as to the most likely cause of death. We have the doctor offered by defendants, who states that the most likely cause of death was heart attack.

"All of the medical witnesses testified that the cause of death in this case was impossible of accurate determination in the absence of an autopsy."

The testimony justified the findings. To this we might add that Dr. Magee, the family physician, testified he saw decedent at the Natchez General Hospital shortly after his death and that he made out the death certificate. That certificate gave as cause of death "acute heart failure decompensation." However, as a witness on the stand, Dr. Magee said he could not say what was the cause of death unless an autopsy had been made.

It was also shown that when Mr. Smith was finally discharged from the hospital, he was given a ten percent permanent disability rating as a result of his accident and informed that he might return to work.

Of course, the burden was upon claimants to establish the fact that Mr. Smith's death resulted from the injury he received while an employee of the Gravel Company, or, at least, to show that such injury was a substantially contributing cause. We must respect the findings of the attorney-referee, the Commission, and the trial judge unless such findings are against the weight of the evidence, or are manifestly wrong. Sones v. Southern Lumber Co., et al., 215 Miss. 148, 60 So. 2d 582. It is evident, we think, as a matter of sound reason and deduction that we cannot say the findings in this case were not justified by the evidence.

Affirmed.

*Hall, Lee, Kyle* and *Gillespie, JJ.,* concur.