Estate of Ernest Dewey Stovall, Deceased
*v.* A. Deweese Lumber Co., et al.

No. 39413 January 24, 1955 77 So. 2d 291

*Laurel G. Weir,* Philadelphia, for appellant.

*Sanford & Alford,* Philadelphia, for appellee.

HOLMES, J.

On March 23, 1951, Ernest Dewey Stovall was killed on the premises of the A. Deweese Lumber Company in Neshoba County when he was assisting Johnny McKinnion in unloading a truck load of logs and one of the logs fell on him. Claim for compensation under the workmen's compensation act was filed on behalf of the widow and minor child of the deceased against the A. Deweese Lumber Company and its insurance carrier, Consolidated Underwriters, predicated upon the ground that the deceased at the time of his death was an employee of the A. Deweese Lumber Company, and that his death arose out of and in the course of his employment.

The attorney-referee denied the claim upon the ground that the relation of employer and employee did not exist between the deceased and the A. Deweese Lumber Company at the time of his death. The commission affirmed the action of the attorney-referee, and on appeal to the circuit court, the action of the commission was affirmed. This appeal is prosecuted by the claimants from the judgment of the circuit court.

The sole question here involved is whether the deceased, at the time of his unfortunate death, was an employee of the A. Deweese Lumber Company or an employee of Johnny McKinnion, an independent contractor. There is no substantial dispute as to the material facts.

In March, 1951, the International Paper Company, a New York Corporation doing business in Mississippi, sold and conveyed to the A. Deweese Lumber Company of Philadelphia, Mississippi, a quantity of storm damaged pine timber located on land in Leake County. The A. Deweese Lumber Company divided the timber into tracts of approximately 20 acres each, and arranged to have the timber cut into logs. It entered into a verbal contract with Johnny McKinnion to bunch, load and haul the logs on a certain designated tract which a representative of the lumber company pointed out to McKinnion on the ground. McKinnion was to be paid so much per thousand for bunching, loading and hauling the logs. He was to furnish his own truck and pay for the oil and gas used and for all expenses of operation. He hired his own laborers, among them the deceased, to bunch and load the logs, and required his laborers to furnish their own teams, tongs, snake hooks, and cant hooks. He paid his laborers $6.00 to $6.50 per thousand, and arranged with the lumber company to deduct from his pay the pay of the laborers and issue checks to them therefor weekly. The laborers usually left their teams in the woods at night, and sometimes some of them would

ride in on McKinnion's truck to the lumber company mill and assist McKinnion in unloading the logs. It was on one of these occasions when the deceased was so assisting McKinnion that he was killed.

. The lumber company was to furnish no equipment whatever. It had nothing to do with the hiring or firing of McKinnion's helpers. It exercised no control over the deceased and others whom McKinnion employed, and no supervision over the manner and details in the performance of the work of bunching and loading the logs. It was interested only in the result of the work which McKinnion had been employed to perform. About once a week, a representative of the lumber company came into the woods and if he saw any logs which had been left in the woods, attention of the laborers was called thereto. He gave no directions as to the method, manner, or details of the work in bunching and loading the logs. When McKinnion was asked on the witness stand if the lumber company could terminate his contract at any time, he said he "supposed so", but he had a contract "to haul that particular portion of timber." The lumber company exercised no control over McKinnion as to the time he should work. He decided when to haul and when not to haul. He fixed the pay of his own servants, among them the deceased, and selected his own servants without suggestion or direction from the lumber company, and directed their work without control or supervision on the part of the lumber company.

We have in numerous cases, both in tort actions and under the workmen's compensation act, set forth the several tests to be applied in determining the relationship of independent contractor. Kisner v. Jackson, 159 Miss. 424, 132 So. 90; Hutchinson-Moore Lumber Company v. Pittman, 154 Miss. 1, 122 So. 191; Crosby Lumber and Manufacturing Co., et al v. Durham, 181 Miss. 559, 179 So. 285; McDonald v. Hall-Neely Lumber Company, 165 Miss. 143, 147 So. 315; Carr v. Crabtree, et al,

212 Miss. 656, 55 So. 2d 408; Sones v. Southern Lumber Company, et al, 215 Miss. 148, 60 So. 2d 582; Simmons v. Cathey-Williford and Jones Co., 70 So. 2d 847.

In Kisner v. Jackson, supra, the court said: "At last, and in any given case, it gets back to the original proposition whether in fact the contractor was actually independent. In our own more recent cases, it has been said that the important tests are whether the alleged 'independent contractor is one who renders service in the course of an occupation representing the will of his employer only as to the result of his work, and not as to the means by which it is accomplished,' and that he is not a master who has no 'right to control the servant; and who is interested in the ultimate result of the work alone as a whole, but not in the details of the performance;' and that 'the main element required to constitute the relationship of master and servant is that the servant be subject to the control of the master in carrying on the business at the time of the injury.' "

 █ Of course the burden was upon the claimants to show that the deceased met his death while an employee of the lumber company. Smith, et al v. St. Catherine Gravel Company, et al, 71 So. 2d 221. The undisputed facts in this case reveal a total failure to meet this burden. It is apparent to us from the undisputed evidence that there is present in this case every essential element necessary to establish the relationship of independent contractor between McKinnion and the A. Deweese Lumber Company. It is argued by the claimants, however, that the lumber company had the right to terminate the contract with McKinnion at any time, and that this evidenced a right of control over McKinnion and the work he was to perform. We do not think the facts show such right in the lumber company. It is true when McKinnion was asked if the lumber company could terminate his contract at any time, he testified, "I suppose so," but he added he had a contract "to haul that particular portion of timber." In determining the right

of the lumber company in this respect, the contract itself is to be looked to and not mere supposition. The evidence without dispute shows that a definite contract was entered into between McKinnion and the lumber company to bunch, load and haul a particular tract of logs, and that McKinnion entered upon the performance of this contract and it is clear from the evidence that it was not subject to termination by the lumber company without cause before its completion.

In Hutchinson-Moore Lumber Company v. Pittman, supra, the Court said: "Appellee's contention that the contract should not be regarded in determining the relationship existing between appellant and Magee because, by its terms, no time was fixed for its completion, is without merit, for the contract plainly provides that Magee was to cut and deliver to appellant at its logging road *all* the merchantable timber from the land specifically described in the contract."

Furthermore, this Court held in Crosby Lumber and Manufacturing Co., et al v. Durham, supra, and Kisner v. Jackson, supra, and Simmons v. Cathey, etc., supra, that the right to terminate is not conclusive of the relationship. In the Crosby case, the Court said:

"The power given an employer under a contract for services to terminate it at will is a fact for consideration in determining whether the contract creates the relation of master and servant, but, of itself alone, is not determinative, and the mere fact that what logs Stockstill should haul were for the determination of Crosby Lumber and Manufacturing Company would not constitute such control over him as to make the relation between them that of master and servant."

We are also of the opinion that proof of the fact that a representative of the lumber company came into the woods about once a week and called attention of the laborers to any logs which had been left in the woods affords no sufficient evidence that the lumber company

was vested with the right of control over the manner and means of doing the work. In this connection, we quote as pertinent the following from the opinion of the Court in the case of Regan et al v. Foxworth Veneer Co., 178 Miss. 654, 174 So. 48:

"The evidence for appellants, however, tended to show that two or three times a week Taylor, appellee's vice-president and general manager, went into the woods where the logging was being done and made suggestions and gave directions as to how the work should be carried on. Taylor admitted that to be true, but testified that it was merely by way of advice, that he had no right to control the crew in any manner, that his plant was sometimes short of logs and his purpose was to hurry up the supply. One or more witnesses testified that Taylor suggested sometimes where it would be well to place the skidder, and his suggestions were followed. There was not a bit of evidence tending to show that under the contract Taylor had the right to exercise any control whatsoever over the manner and means of doing the work. The crew was bound to know from all the facts and circumstances that Ball Bros. was their master and not Taylor."

We also quote as pertinent the following from the opinion of the Court in the case of Cook, et al v. Wright, 177 Miss. 644, 171 So. 686: "It is not necessary that an owner or employer, in order to avoid the responsibilities of master, shall entirely absent himself from the work, or entirely disassociate himself from an active interest, or an active aid in the course of its performance, or from a supervision of the results of that performance, so long as, in respect to the details of the work necessary, or proper, to be performed for the production of the net results required by the contract, the physical management of the instrumentalities used, and the physical conduct of those employed therein, remain under the sole

control of the contractor, or of those placed in authority by him or by his selection and direction.''

■■ The case of Regan, et al v. Foxworth Veneer Company, supra, which is strongly in support of the conclusions we have reached, enumerates among the tests for the determination of the question, ''whose servant is this?'' the following: ''(1) the right to select the servant; (2) the right to discharge the servant; (3) the right to control the servant; and (4) he is not a master who is interested only in the ultimate result of the work as a whole and not in the details of the performance.'' The evidence in the case before us wholly fails, in our opinion, to show any right in the lumber company to select the servant, or to discharge the servant, or to control the servant, and clearly establishes the fact that the lumber company was interested only in the ultimate result of the work as a whole and not in the details of its performance.

■■ We are not unmindful of the fact that in determining whether the relationship of employer and employee exists, a more liberal rule is to be applied under the workmen's compensation act than in negligence cases, but it is clear to us that under the most liberal interpretation of the undisputed facts in this case the claimants have failed to meet the burden of showing that the relationship of employer and employee existed between the deceased and the lumber company at the time he was killed. It follows, therefore, from these views that the judgment of the court must be, and it is, affirmed.

Affirmed.

All Justices concur, except *Kyle, J.,* who dissents.

———

Kyle, J., dissenting.

The pertinent facts in this case are undisputed and the ultimate conclusion to be drawn from the facts is a question of law.

It is conceded that Ernest Dewey Stovall was killed on the premises of the A. Deweese Lumber Company, in Neshoba County, on March 23, 1951, when he was assisting Johnny McKinnion in unloading a truck load of logs and one of the logs fell on him. The deceased had been employed to bunch and help load logs about four weeks before he was killed. Whether he was an employee of the A. Deweese Lumber Company or merely an employee of Johnny McKinnion depends upon the interpretation that the Court places upon the facts testified to by the witnesses. If McKinnion's relation to the lumber company was that of an employee, Stovall was likewise an employee of the lumber company. But if McKinnion was an independent contractor, Stovall was an employee of McKinnion.

The testimony in my opinion shows that McKinnion was not an independent contractor, but an employee of the lumber company.

McKinnion testified that he had been working for Deweese approximately two years. The logs that McKinnion was hauling at the time Stovall was killed were logs that had been cut by Deweese's timber cutters on a large tract of land owned by the International Paper Company, in Leake County; and, although McKinnion testified that he was "contracting", and not working for wages, the proof shows that he was merely one of several loggers, who had been employed by Deweese to bunch and haul logs cut by Deweese's timber cutters from storm-damaged timber on the International Paper Company lands. Here is what McKinnion said about his so-called contract to bunch and haul logs:

"By MR. WEIR:

"Q. You say, now, you had an agreement there with the Deweese Lumber Company to haul and to load and haul all that storm damage timber on a certain portion, is that right? A. Yes, sir. Q. Now, on certain portions, wasn't it, Johnny? A. Well, yes, sir, I couldn't tell

you which portions. Q. How many acres? A. I don't know. Maybe twenty acres. Q. You would just start on a certain portion? A. And clean up and get on another one. Q. Did you make separate trades on each portion? A. No, we stayed around the same place. Q. Did you make a separate trade with them each time that you would finish one portion and start another one or not? A. No, we just went on to the next portion. Wasn't no more trade. Q. Was he paying you by the thousand or by the block? A. By the thousand.''

McKinnion had nothing to do with the cutting of the timber. It was his duty to bunch and haul the logs on the blocks of land pointed out to him by Dick Allen, the agent of the lumber company, as his area to log from. There were other loggers at work on adjoining areas. When McKinnion cleaned up one block he moved on to the next.

McKinnion testified that he was paid $16 or $17 per thousand feet for the logs that he hauled — he did not remember the exact amount. He said they gave him a raise later on. He was asked, ''Who fixed the price there for the work?'' His answer was, ''Well, I reckon Dick (Allen) or some of them fixed it at the office.''

McKinnion furnished his own truck, hired his own helpers, and paid them by the thousand feet. Dewey Stovall furnished his own team, which consisted of a pair of horses that he had purchased from the Deweese Lumber Company and for which he had executed a title reservation note for $125 payable to the lumber company. The company paid off once a week. The helpers were paid directly by the lumber company, and their pay was deducted from McKinnion's pay check.

Traditional test of the employee-employer relationship is the right of the employer to control the details of the work. All other tests are subordinate and secondary. Larson says that the principal factors showing the right of control are: (1) Direct evidence of the right

or exercise of control; (2) method of payment; (3) the furnishing of equipment; and (4) the right to fire.

The direct evidence of the lumber company's right of control in this case is, in my opinion, conclusive. Deweese had purchased only the storm-damaged pine timber on the International Paper Company lands, and under the stumpage sale contract, which was dated March 15, 1951, it was agreed that the buyer should have only until June 1, 1951, within which to cut and remove the timber. Deweese, under the contract, expressly assumed full responsibility for and agreed to pay damages for any timber cut or damaged in its timber cutting and logging operations, other than the storm-damaged timber marked with yellow paint, as provided in the contract. It is wholly unreasonable to assume that Deweese, after purchasing the timber under the conditions stated above, would employ a large number of timber cutters and loggers to cut and remove the timber and in doing so relinquish or contract away its right to control the work; and there is nothing in the record to indicate that Deweese did relinquish its right of control.

On the contrary, Deweese took the necessary steps to safeguard its right of control. Deweese employed the timber cutters to cut the timber; and Deweese's agent parceled out the land on which the storm-damaged timber was situated and assigned to each logger a specified area in which he was to operate. McKinnion was asked the direct question, "They would point out to you what your area to log from?" And his answer was, "That's right." After the logs were bunched and hauled away, Deweese's representative checked behind the logger and his helpers to see that all of the logs that had been cut were hauled to the mill. Otis Stovall testified that, after Dewey was killed, he went back over there and worked. Some one else had left a good many trees on the ground, and Mr. Smith came down there and found them and told the workmen where they were; and Otis said, "We

went back there and picked them up." As each block was cleaned up the logger and his helpers would move on to another block. In no other way could the logging operations on such a large body of land have been carried on by the several crews, each crew operating independently of the others, without confusion and duplication of effort. The above mentioned facts show that management had complete control of the logging operations; and it was not necessary for Deweese to maintain a full time watchman to supervise McKinnion and his helpers in loading the logs, and its failure to do so under the facts in this case did not affect the status of McKinnion and his helpers as employees of the lumber company.

McKinnion was asked, "Who determined how they would pay you?" His answer was, "Well, they would hold mine and his'n out — make separate checks." He was asked specifically about Stovall's pay; and his answer was, "They always gave the check." He said the company paid off once a week. He had not asked that he be paid once a week. "They just paid it that way."

But, if there were any remaining doubt as to Deweese's right of control, that doubt is removed by a reading of McKinnion's testimony in answer to questions propounded to him relative to Deweese's right to terminate his employment. McKinnion's testimony on that point was as follows: "Q. Could Deweese have cut the contract off or not? A. They could have laid me off. Q. They could have laid you off at any time? A. That's right. Q. And you couldn't have made them kept on hiring you? A. No. Q. Or else pay you damages for breach of contract? A. No."

Larson says, "The power to fire is the power to control. The absolute right to terminate the relationship without liability is not consistent with the concept of independent contract, under which the contractor should have the legal right to complete the project contracted

for and to treat any attempt to prevent completion as a breach of contract." Larson's Workmen's Compensation Law, Vol. 1, 654, par. 44.35. See also cases cited.

McKinnion cannot be deemed to have been independent when his work could be stopped at the will of his employer. The power to terminate the employment, of necessity, gave to the employer the power to control the activities of the employee and his helpers, and, as stated by the Louisiana Court in the case of Deason v. Coal Operators Casualty Co. (La. App.), 43 So. 2d 630, "when such a situation prevails, it cannot be said that there is an agreement as to the specified result of the work, either as a unit or as a whole, because there is no certainty as to the result and no means existing independent of the will of the employer for determining and limiting finally the work to be performed."

But it is said that this Court has held in other cases where the facts were similar to the facts in this case that the relationship of the logger or trucker was that of an independent contractor, and not that of an employee; and the cases mainly relied upon are Hutchinson-Moore Lumber Co. v. Pittman, 154 Miss. 1, 122 So. 191; Crosby Lumber & Manufacturing Co. et al. v. Durham, 181 Miss. 559, 179 So. 285; McDonald v. Hall Neely Lumber Co., 165 Miss. 143, 147 So. 315; and Carr v. Crabtree, et al., 212 Miss. 656, 55 So. 2d 408.

All of the above mentioned cases, however, are distinguishable from the case that we have here. In Hutchinson-Moore Lumber Company v. Pittman, supra, the controlling factor, as the Court pointed out in its opinion, was that the contract plainly provided that Magee was to cut and deliver to the appellant at its logging road *all* the merchandise timber from the lands specifically described in the contract. In Carr v. Crabtree, et al., supra, Carr Brothers had a definite contract for the cutting and hauling of all the timber 12 inches in diameter and above, except hickory, on the tract of

land known as the "Thompson Place." In Crosby Lumber & Manufacturing Co. v. Durham, supra, the contract was a written contract which the Court held constituted Stockstill an independent contractor; and the logs to be hauled were the logs cut on a specifically described tract of land. In McDonald v. Hall-Neely Lumber Co., supra, which was decided by a divided court, the majority opinion stated that, "Gray was a public hauler in and around New Albany, and between that place and Memphis and other points." It thus appears that in each of the above mentioned cases there was a definite contract or agreement for a specified amount of work. In the case that we have here there was no such definite contract or agreement.

Dewey Stovall was killed on Deweese's premises, while unloading Deweese's logs. The work that he was engaged in performing was an integral part of Deweese's lumbering operation. In my opinion, the evidence shows that Johnny McKinnion was Deweese's employee, and not an independent contractor, and that Dewey Stovall was an employee of the lumber company. It is admitted that Stovall's injuries arose out of and in the course of his employment. I think his wife and 4-year old boy are entitled to death benefits under the Workmen's Compensation Act.