SULLIVAN *v.* C. & S. POULTRY Co., INC.

No. 40862     October 13, 1958     105 So. 2d 558

*Carl E. Berry,* Hattiesburg; *Wm. S. Murphy,* Lucedale, for appellant.

*Dudley W. Conner, Paul H. Holmes,* Hattiesburg, for appellees.

RorEBDS, P. J.

On May 11, 1956, appellee, C. & S. Poultry Company, was a large processor of chickens for sale in the open market. Charles V. Sullivan, the appellant, was in the employ of C. & S. Poultry Company. Appellee, New Amsterdam Casualty Company, was the insurer of the Poultry Company under the Mississippi Workmen's Compensation Act. It was Sullivan's duty to assist in removing feathers from the chickens after they had pass-

ed through a vat of warm water diluted with a chemical designated as Klenzade. Sullivan claims that in the course of his work he became wet with this solution, which caused an irritation to his hands, legs, face and eyes, producing what is called contact dermatitis, resulting in the formation of cataracts upon both of his eyes. From the rash upon his hands, legs and body, Sullivan was totally but temporarily disabled from May 11, 1956, to June 11, 1956, during which time the Poultry Company voluntarily paid compensation to him. The attorney-referee, the full Commission, and the circuit court, after a lengthy hearing, found as a fact that the contact dermatitis, resulting from Sullivan's body being wet, did not produce, or contribute to the formation of, the cataracts in the eyes. In other words, these tribunals found that there was no causal connection between the contact dermatitis and the cataracts. From that finding and that conclusion, Sullivan appealed to this Court. The only question involved on this appeal is whether these tribunals had substantial evidence to support their conclusions. The burden of showing causal connection was upon Sullivan. This contention requires that we set out the substantial parts of the testimony bearing upon the question of causal connection.

The Poultry Company slaughters some twenty-five thousand chickens a day. The chicken is hung on a conveyer line where it is slaughtered and then moved by a conveyor line to a scalder, and thence to a picking machine. A chemical designated Klenzade is added to the water in the scalding vat. Klenzade is a trade name for a disinfectant which contains the active ingredients of 8.4% sodium hypochlorite and 91.6% inert ingredients. Klenzade is mixed with water by a machine which dilutes the chemical in the proportion of one part Klenzade to one million parts of water, thereby resulting in a solution of one part sodium hypochlorite to twelve million parts of water. This combination complied with re-

quirements of the Federal Pure Food Act. A number of witnesses testified that they had drunk this water, thus diluted, with no ill effects. It appears also that Sullivan was the only person who had developed this type of rash from contact with this solution.

Sullivan testified. He had been working for the Poultry Company seven or eight days before he developed the dermatitis. He was by trade a carpenter. He explained the process of picking feathers from the chickens. He said his legs, arms, face, etc., got wet while he was working at the vat. He was forty-nine years of age, married, with three children. The important part of his testimony, on the issue involved, is the inference, at least, that his eyesight had been all right before he became wet at the vat.

Sullivan was sent by his employer to Dr. T. E. Ross. He saw and examined Sullivan May 12, June 8, and July 10, 1956. Dr. Ross testified, in effect, Sullivan's trouble was contact dermatitis, and he treated Sullivan for that until June 8th, when Sullivan was discharged as being able to go back to work on June 11th. Sullivan, when he first came to Dr. Ross, did not complain of his eyes. Later he did. Sullivan had a mature cataract in the right eye and an incipient cataract in the left eye. Dr. Ross testified: "I did not see any connection beween that and the dermatitis." His opinion was the cataract condition had been coming on for a considerable time.

Dr. R. P. Vincent testified. He is an eye, ear, nose and throat specialist. He examined Sullivan July 12th and July 19th. Sullivan said he had gotten some water on his legs, arms, hands and face and developed a rash. Then he began to see with difficulty. On July 12th the doctor found that Sullivan had 20/400 vision in the right eye and 20/50 in the left eye. He thought the cataracts were of recent origin. That was based largely on reports made to him by Sullivan, that the condition had recently developed, which he, the witness, accepted as

true. He was asked if the addition of chlorine, and "such substances", would cause cataracts, and replied: "No, sir, I don't believe I have ever seen a case." He was also asked: "You would not tell this court that chlorine in water for the purpose of protection would be injurious to the human eye, would you?" He replied: "I have never seen a case of cataract, if that is what you have reference to." He did not detect any burn. He said chlorine is toxic and his testimony would justify the conclusion that he thought that dermatitis brought about a toxic condition which resulted in the formation of the cataracts, although he was asked: "Could any application of a chemical cause the cataracts?", and replied: "I don't think so." He summed up his conclusions in the words: "I can't state positively that that is the cause of the man's cataracts, but in a man of his age it would be rather rare. You don't see cataracts in one until they are sixty or seventy, or unless it is due to trauma or exposure to some toxic chemical thing like this." He said "Cataracts resulting from age usually develop in the adult nucleus." In Sullivan's case "It was in the adult nucleus of the lens." He was asked if normally a cataract would develop within twenty-four hours from a toxic condition resulting from dermatitis and he said it would not.

However, he expressed the opinion that the cataracts he found on his examination July 12th might have developed from toxic poison after May 11th.

Dr. Eugene S. Busby, eye, ear, nose and throat specialist, examined Sullivan's eyes on June 19, and July 23, 1956. Sullivan had a vision of 20/400 in his right eye and 20/40 in his left eye. In other words, he had a mature cataract in his right eye in the adult nuclei and an incipient, or beginning, cataract in his left eye. The cataract in the right eye he described as a sub-capsular cataract. He said it was being brought on by senile changes in the body. He then set out his reasons for his con-

clusions. He explained that in the senile cataracts the eye gives off little scales which can be seen with the microscope. He saw these scales. He also found that Sullivan had hardening of the arteries. He said the condition in the right eye had been developing for a num- ber of years; that it could not have developed in twenty-four hours. He explained the nature of result of toxic cataracts upon the eyes and said he found no evidence that the cataracts in Sullivan's eyes were the result of toxic poison. He named a number of conditions which might bring about a toxic condition but he said the chemical involved in this case was not one of them. He was then asked if the water-chloride solution involved in this case would produce a toxic condition that would result in a cataract, and he replied: "I never heard of it." In his examination of July 23rd he found no material change from the conditions which existed June 19th. He further said that from the condition he found on his two examinations that Sullivan's cataract had been coming on for some two and one-half to three years. He noted that hypochlorite is an alkali and not an acid.

Dr. Earl W. Green is an eye, ear, nose and throat specialist. Counsel agreed he was qualified in his profession. He testified as a specialist and not from an examination. He explained the difference between senile cataracts and cataracts which might be produced by physical substance operating upon the eye itself. He was asked if the dermatitis condition of Sullivan's legs, arms and body could have produced a cataract in four or five months, and he gave this answer: "In my experience I know of no condition in which it will. I have never read of any condition. I have never had a case in which it did." He was further asked whether or not the water-hypochlorite solution involved in this case could have produced cataracts in Sullivan's eyes in three or four months time and he replied that it could not. He then named the drugs which might produce a traumatic con-

dition by coming in contact with the eye and said that sodium hypochlorite did not include any of them. He then said that sodium hypochlorite would not cause a cataract and would not create a trauma that would cause a ripened cataract. He said that if the injury was caused by trauma "it can be diagnosed definitely."

Dr. Emmett McDonald Herring testified he was an eye, ear, nose and throat specialist connected with the Green Clinic at Hattiesburg. He was asked if sodium hypochlorite taken into the blood stream would cause a cataract and he replied: "I don't know of a case where that has happened. I have never seen it reported in literature and in my experience I have never seen such a case." He said the most common cause of cataracts was hardening of the arteries. He also said sodium hypochlorite was innocuous when diluted. He said he served in the Army and that the soldiers drank water purified by hypochlorite. He said: "They were required to drink water that had been purified with chlorine as the active ingredient or sodium hypochlorite, and we never had any difficulty." He said no cataract would result from dermatitis caused by water in which sodium hypochlorite had been added. Sodium hypochlorite is used for many things, such as reducing swelling and in bathing the feet. He explained the different types and kinds of cataracts. He said if a cataract developed quickly it was usually the result of diabetes. He was asked this question: "All right, sir, doctor, would the toxic effect set up in a man's body through the absorption of chlorine and this hypochlorite and carried to the eye, would that have the effect of causing damage to this optic nerve?" and he replied: "I have never heard of it." He said he knew of no case where hypochlorite caused a toxic effect in the blood that affected the eye. He explained that hypochlorite is an alkali and he did not think that hypochlorite, coming in contact with the eye, would permanently damage the eye.

All of these doctors testified that the excessive use of alcohol tended to produce cataracts in the eyes. It was shown by a number of witnesses that Sullivan was an excessive and habitual user of alcohol. Indeed, he had been convicted a number of times of public drunkenness, and in December 1955, on the petition of his wife, he was sent to the Mississippi State Hospital for treatment of this habit.

It will be noted that Sullivan claimed that his bad eyesight came on shortly after he became wet by the hypochlorite-water solution at the vat. It was shown by a number of witnesses, in contradiction of that condition, that before May 11th Sullivan could not see sufficiently well to help install a lock on a door, although he was a carpenter, and that he could not see sufficiently well to punch a time card, he had to get someone else to do that.

There were other witnesses than those mentioned above but in our view we have summarized the most pertinent and probative testimony which appears in the record.

■■ The burden of proof was upon the claimant to prove the causal connection between his cataracts and his employment. Mrs. Ava Johnson Dillion, et al. v. Gasoline Plant Construction Corporation, et al., 75 So. 2d 80; Estate of Tommy Oatis v. Williamson & Williamson Lumber Company, et al., 92 So. 2d 557; Nicholas Company, Inc., et al. v. Henry Dodson, 99 So. 2d 666.

■■ Time and again this Court was held that where there is a substantial evidence to support the findings of the lower tribunals in compensation cases, this Court is not at liberty to override said findings. Brown Buick Co., et al. v. Smith's Estate, 52 So. 2d 664; Thornton v. Magnolia Textiles, Inc., et al., 55 So. 2d 172; Sones v. Southern Lumber Co., et al., 60 So. 2d 582; Smith, et al. v. St. Catherine Gravel Co., et al., 71 So. 2d 221; Dowdle & Pearson, Inc., et al. v. Hargrove, 75 So. 2d 277; Mississippi Products, Inc. v. Gordy, 80 So. 2d 793; California Eastern Airways, Inc. v. Jesse Neal, Jr., 87 So. 2d 895;

Anderson v. Ingalls Shipbuilding Corporation, et al., 91 So. 2d 756.

██ █ A careful reading of this record forces us to the conclusion that the great weight of the testimony is to the effect that the fact that Sullivan's body became wet with the sodium hypochlorite solution on May 11, 1956, had no causal connection in bringing about the cataract condition of his eyes.

Sullivan also contends that his getting wet, as above-described, caused a permanent impairment in his hearing. The point is raised but not pressed on the appeal. However, the lower tribunals had ample testimony to support their rejection of the contention. Sullivan never mentioned this when he first went to Dr. Ross. In addition, a number of the doctors who testified saw no causal connection between the fact that Sullivan got wet and his claim of defective hearing as a result thereof. Indeed, it is quite uncertain that Sullivan's hearing was, in fact, defective. On that question the attorney-referee embodied this statement in his findings: ''As a witness the claimant professed to be hard of hearing to the extent that the attorneys, in propounding quesions from a distance of a few feet, were time and again forced to restate questions in an abnormally loud voice. It was noted, however, that as witnesses for the defense were being questioned, claimant, sitting a considerable distance from the witness, was apparently able to hear the questions and answers spoken in a normal voice and confer with his counsel in regard thereto. His demeanor on the witness stand and the inconsistencies and contradictions in and to his testimony are such that I am of the opinion that his testimony is of negligible value.''

Affirmed.

*Hall, Holmes, Ethridge* and *Gillespie, JJ.,* concur.