CARR *v.* CRABTREE, et al.

In Banc. Dec. 3, 1951.

No. 38102 (55 So. (2d) 408)

**J. A. Phillips,** for appellant.

**Sams & Jolly,** and **Rae Bryant,** for appellees.

**Kyle, J.**

This is a workmen's compensation case. The case was heard before the attorney-referee on September 11, 1950, and a decision was rendered in favor of the claimants. C. T. Crabtree, the alleged employer, and the Bituminous Casualty Company, the insurance carrier, then appealed to the whole commission. The commission on October 10, 1950, in a two-to-one decision, sustained the findings of the attorney-referee and made an award in favor of the claimants, Edna Bell Carr, the surviving widow, and Gloria Jean Cotton, minor foster child of the deceased. From the decision of the commission, sustaining the findings of the attorney-referee and making an award to the claimants, the defendants appealed to the Circuit Court of Noxubee County. The case was heard before the circuit judge in vacation on November 20, 1950, and an order was entered by the circuit judge reversing the order of the commission, and judgment was rendered for the defendants. From that order the claimants prosecute this appeal.

According to the findings of the attorney-referee, the deceased, John Henry Carr, was killed in an accident arising out of and in the course of his employment on July 17, 1950. Carr was killed by a log falling on him while he was engaged in felling and hauling timber for Crabtree. The deceased was survived by his widow, Edna Bell Carr; and the deceased and his wife, at the time of the death of the deceased, were maintaining in their home the minor child, Gloria Jean Cotton, nine years of age, who was the daughter of Edna Bell Carr's sister.

The facts in the case are in the main undisputed. C. T. Crabtree was a lumber manufacturer and owned and operated a saw mill at Macon. During the spring of 1950 Crabtree purchased a tract of timber, known as the Thompson tract, and entered into a verbal agreement with the deceased, John Henry Carr, and his brother Martin Carr, to cut the timber and haul the same to Crabtree's mill. The tract of timber which Carr Brothers agreed to cut and haul to Crabtree's mill was estimated to contain between 300,000 and 500,000 feet. The cutting and hauling were to be done for a unit price, and Carr Brothers were to receive $11.50 per thousand feet, log scale, as compensation for their services. The Carr brothers were to furnish their own truck, teams and tools which were to be used in the cutting and hauling of the timber. They hired additional workmen to assist them in cutting the timber and hauling the same to the mill. The names of these workmen did not appear on the payroll of the Crabtree Lumber Company.

C. T. Crabtree and Martin Carr, the surviving partner, both testified upon the hearing before the attorney-referee. Crabtree was called as an adverse witness by the claimants, and Martin Carr was called as a witness for the claimants.

Crabtree testified as to the terms of the agreement that had been made between him and the Carr brothers for the cutting and hauling of the timber. It was an agree-

ment for the cutting and hauling of all the timber 12 inches or more in diameter, except the hickory timber, on the Thompson tract. The logs were to be delivered on Crabtree's mill yard, where they were to be scaled by Crabtree. The Carr brothers were to be paid $11.50 per thousand feet, log scale, for the cutting of the timber and the hauling of the logs to the mill. No time limit was fixed by the parties within which the contract was to be completed. Crabtree testified that the Carr brothers devoted their own time to the timber cutting and logging operations, and employed their own labor to assist them in the performance of the contract; that they usually worked five days each week, if the weather was good; that they regulated their own time for going to work and for quitting; that they determined for themselves the number of workmen that they would employ, and fixed the wages of their employees; that they used their own truck and their own axes and saws. Crabtree stated that he paid Carr Brothers at the end of each week at first, and later every two weeks, for the logs delivered by them at the mill; that Carr Brothers purchased their own truck parts and repair parts, and furnished their own oil, gasoline and other supplies; that he did not make advancements of money to them for the purchase of supplies, and that he did not "stand for their notes on the truck or for any parts." Crabtree stated that he had an old truck on the mill yard that he had purchased in 1939, and had junked because it was worn out and that he told the Carr brothers that they could use it if they wanted to fix it up; that the Carr brothers had the truck repaired and reconditioned at their own expense, so that they could use it, and thereafter used the truck in their logging operations along with the truck which they already owned. Crabtree stated that he went into the woods once or twice a week and inspected the cutting, and that on one occasion Carr Brothers got behind with their operations and he put a truck of his own on the job to help them keep logs at the mill. In answer to a question pro-

pounded to him by the claimants' attorney as to whether he had a right to terminate the contract at any time, Crabtree said, "No; there wasn't nothing said about it."

Martin Carr testified that he and his brother had always worked together; that they had contracted to cut and haul several blocks of timber for Mr. Henry Sparkman prior to the time they entered into the agreement with Mr. Crabtree for the cutting and hauling of the timber on the Thompson place; that Carr Brothers had traded with Mr. Sparkman for the cutting and hauling of timber for him at different prices, and that under the last contract they had performed for him they had been paid $15 per thousand feet for the cutting and hauling of the timber; that they had also cut and hauled other tracts of timber for Mr. Crabtree; and that they had at times bought timber themselves and cut and hauled it and sold it to the Fair Lumber Company. Martin Carr testified further that when he and his brother began their timber cutting operations on the Thompson tract Mr. Crabtree pointed out to them the boundary lines of the tract which they were to cut, and told them that he had bought the hardwood timber 12 inches or more in diameter at the stump, and that Mr. Crabtree gave them instructions as to the lengths of the logs to be cut; that while they were engaged in cutting the timber Mr. Crabtree came into the woods sometimes once or twice a week, but sometimes he did not see him at all. Martin Carr stated that Mr. Crabtree never tried to tell the Carr brothers whom they should hire or whom they should fire; that after the Carr brothers had traded with Mr. Crabtree to cut and haul the timber on the Thompson tract, they sublet the actual felling of the trees and the cutting of same into logs to Eugene Rogers, and agreed to pay Rogers the sum of $3.50 per thousand feet to cut the logs for them; that Rogers then hired his own labor to help him fell the timber and cut it into logs; and that Mr. Crabtree had nothing to do with their contract with Rogers. Martin Carr stated that he and his brother

agreed with Mr. Crabtree to cut the block of timber for $11.50 per thousand feet and deliver it at the mill; that he still regarded the contract as a binding contract; and that he was still cutting and hauling and delivering logs at the mill under the terms of the agreement.

In his findings the attorney-referee stated that it was apparent that at the inception of the transaction Crabtree intended that the relationship of the Carr brothers to him should be that of independent contractors, but that it developed later that the Carr brothers were unable to carry on with their part of the agreement without assistance, and that Crabtree found it necessary to offer assistance, which according to his testimony he did from time to time. The attorney-referee found that the relationship of the Carr brothers was therefore not that of independent contractors, but that the Carr brothers were employees of C. T. Crabtree, and that the claimants were entitled to an award of compensation under the Workmen's Compensation Act. Laws 1948, c. 354.

In their order affirming the findings of the attorney-referee, a majority of the commissioners emphasized the fact that the financial status of the Carr brothers was a factor which should be taken into account in determining their legal status as independent contractors, and in their order the commissioners said, ''We feel that an independent contractor should be an operator of substance, with his own equipment, his own means of financing operations, and complete and final supervision over his entire operations.'' The commissioners also made the following statement: ''In the case at hand the timber cutting, bunching of logs, and hauling of logs was probably one half or more of the cost of Crabtree's operation from the standpoint of labor, and was an essential step in operating the mill. To hold that a continuing operation was under two separate and independent managements, each of which by its very nature was dependent upon the other, and so closely geared that the failure of one to function would disrupt the schedule of the other,

would serve to evade the compensation law, whether intentional or not, and would take protection from those employees most in need and least able to provide for themselves in the event of accidents.''

The circuit judge after reviewing the record on appeal found that the order of the commission making an award of compensation to the claimants was not supported by the evidence, that the deceased, John Henry Carr, was not an employee of the defendant-appellant, C. T. Crabtree, when he met his death, but an independent contractor, and that the deceased was not covered by the Mississippi Workmen's Compensation Law; and the court therefore reversed the order of the commission and entered judgment for the defendants, C. T. Crabtree, and the insurance carrier.

We have made a careful study of the record and the briefs submitted by the attorneys for the respective parties. We are reluctant to reverse an order of the commission making an award in a case of this kind. But in our opinion the judgment of the circuit court reversing the order of the commission must be affirmed.

The law defining the relationship of master and servant and the relationship of independent contractor has been well settled by the decisions of this Court, and the difference between the relationship of master and servant and the relationship of independent contractor has been discussed in many of those decisions.

In the case of Crosby Lumber & Manufacturing Co. v. Durham, 181 Miss. 559, 179 So. 285, 287, 854, this Court said: ██ ''A servant is a person employed by a master to perform service in his affairs whose physical conduct in the performance of the service is controlled or is subject to the right to control by the master. ██ An independent contractor is a person who contracts with another to do something for him, but who is not controlled by the other, nor subject to the other's right to control with respect to his physical conduct in the performance of the undertaking.'' Restatement of the Law of Agency,

par. 2, p. 11; Texas Co. v. Mills, 171 Miss. 231, 156 So. 866. See also Gulf Coast Motor Express Co., Inc., v. Diggs, 174 Miss. 650, 165 So. 292; Texas Co. v. Jackson, 174 Miss. 737, 165 So. 546; Meridian Taxicab Co., Inc., v. Ward, 184 Miss. 499, 186 So. 636, 120 A. L. R. 1346; Texas Co. v. Wheeless, 185 Miss. 799, 187 So. 880.

In discussing the indicia of the independent contractor relationship as contrasted with the relationship of employee, in 27 Am. Jur. p. 485, the text writer says:

"Although it is apparent, from an examination of cases involving the independent contractor relationship, that there is no absolute rule for determining whether one is an independent contractor or an employee, and that each case must be determined on its own facts, nevertheless, there are many well-recognized and fairly typical indicia of the status of an independent contractor, even though the presence of one or more of such indicia in a case is not necessarily conclusive. It has been held that the test of what constitutes independent service lies in the control exercised, the decisive question being as to who has the right to direct what shall be done, and when and how it shall be done. It has also been held that commonly recognized tests of the independent contractor relationship, although not necessarily concurrent or each in itself controlling, are the existence of a contract for the performance by a person of a certain piece or kind of work at a fixed price, the independent nature of his business or his distinct calling, his employment of assistants with the right to supervise their activities, his obligation to furnish necessary tools, supplies, and materials, his right to control the progress of the work except as to final results, the time for which the workman is employed, the method of payment, whether by time or by job, and whether the work is part of the regular business of the employer."

In the case of New Orleans, B. R., V. & M. R. Co. v. Norwood, 62 Miss. 565, 52 Am. Rep. 191, the Court in discussing the tests to be applied in determining whether

the relationship of master and servant exists under any given state of facts, said that "he is not a master who is interested in the ultimate result of the work done as a whole, but not in the details of its performance." And in the case of Callahan Const. Co. v. Rayburn, 110 Miss. 107, 69 So. 669, the Court held that an independent contractor is one who renders service in the course of an occupation representing the will of his employer only as to the result of his work, and not as to the means by which it is accomplished. In the case of Crescent Baking Company v. Denton, 147 Miss. 639, 112 So. 21, the Court said that the essential element required to constitute the relationship of master and servant is that the servant be subject to the control of the employer in carrying on the business at the time of the injury.

The distinction between the master and servant relationship and the independent contractor relationship, in cases like the one that we now have before us, has been clearly pointed out in the opinions rendered by this Court in the more recent cases of Hutchinson-Moore Lumber Co. v. Pittman, 154 Miss. 1, 122 So. 191; McDonald v. Hall-Neely Lumber Company, 165 Miss. 143, 147 So. 315; Cook v. Wright, 177 Miss. 644, 171 So. 686, and Regan v. Foxworth Veneer Co., 178 Miss. 654, 174 So. 48.

In the case of Hutchinson-Moore Lumber Company v. Pittman, supra, the plaintiff was a member of a timber crew employed by one Magee who had entered into a formal contract with the Hutchinson-Moore Lumber Company for the felling and sawing into logs of all the pine and hardwood timber standing on a certain tract of land and for which Magee was to be paid the sum of 95¢ per thousand feet log scale. Magee, after operating a while under his contract with the lumber company, sublet the contract to one Griffin who thereafter employed the plaintiff as a member of the timber crew engaged in the timber-cutting operations at the time that the plaintiff was injured. Magee still continued to exercise supervision and control over Griffin and his employees, but

there was no evidence tending to show that the lumber company's superintendent ever exercised any control over the operations of the timber crew except as to the net results contracted for by the lumber company. The Court held in that case that the contract between the lumber company and Magee fixed Magee's relationship to the lumber company as that of an independent contractor, and that the lumber company was not liable for plaintiff's injuries. The Court said: ''By the terms of the contract, Magee obligated himself alone to bring about certain net results. The method or manner of bringing about such results were, by the contract, left solely with Magee. * * * We think it clear that Magee was an independent contractor in and about the work he was directing when appellee was injured, there being no substantial conflict in the evidence on that issue of fact.'' [154 Miss. 1, 122 So. 193.] The Court in its opinion also stated that, ''Appellee's contention that the contract should not be regarded in determining the relationship existing between appellant and Magee because, by its terms, no time was fixed for its completion, is without merit, for the contract plainly provides that Magee was to cut and deliver to appellant at its logging road *all* the merchantable timber from the lands specifically described in the contract.''

In the case of McDonald v. Hall-Neely Lbr. Co., supra, the evidence disclosed that at the time of the appellant's injury and for some time prior thereto, the appellee was engaged in the manufacture of lumber with its plant at New Albany. The logs which it manufactured into lumber were bought from various owners in Union and surrounding counties. It bought the merchantable timber on Porter Ray's land in Pontotoc County. Porter Ray cut the timber and hauled and piled the logs on the public highway leading to New Albany. The appellee contracted with Gray and two other persons to haul these logs to its mill agreeing to pay them so much per thousand feet. While Gray was carrying out his part of the

contract the collision and injuries occurred. At the time of the collision, Gray's truck, driven by him, was loaded with some of the logs on its way to New Albany to appellee's plant. The contract between Gray and the appellee was a verbal contract. He was to haul no specific number of logs, and was to haul when it suited him. The agreement was that he was to furnish his own truck and his help. In other words, he was to bear the entire expense incurred by him in hauling the logs. In making the trips he sometimes drove his truck, and sometimes he employed another to drive it. The appellee had no control whatever over the manner, method, or means of hauling the logs. The only control appellee had over Gray's operations was as to where he should get the logs and the place he should unload them at the mill. The Court said in that case that "The relation of master and servant does not exist, unless the alleged master has some sort of substantial control over the means and methods of carrying out the contract. What logs Gray should haul and where he should place them did not constitute such control by appellee." [165 Miss. 143, 147 So. 316.] And the Court held that the relation between the appellee and Gray was not that of master and servant; that Gray was an independent contractor.

In the case of Cook v. Wright, supra, the appellant Cook had entered into a written contract with the State Highway Commission for loading, hauling and distributing gravel, crushed stone, slag, sand and clay in the Fifth Maintenance Division for a six months period, according to approved plans, specifications and requirements of the State Highway Department. Cook sublet the contract to Broadfoot, and under his contract with Broadfoot he was to pay Broadfoot a fixed sum per cubic yard for the gravel, stone, slag, sand and clay loaded and hauled and distributed by Broadfoot. Broadfoot had been engaged for several years in road construction and maintenance work, and owned several trucks and had under hire several laborers. While the work was being performed

by Broadfoot under his subcontract, Wright, an employee of Broadfoot, was seriously injured through the negligence of Broadfoot's foreman. The Court held that Broadfoot was an independent contractor and that Cook was not liable for the injury to Broadfoot's employee. And the Court stated in that case that, "It is not necessary that an owner or employer, in order to avoid the responsibilities of master, shall entirely absent himself from the work, or entirely disassociate himself from an active interest, or an active aid in the course of its performance, or from a supervision of the results of that performance, so long as, in respect to the details of the work necessary, or proper, to be performed for the production of the net results required by the contact, the physical management of the instrumentalities used, and the physical conduct of those employed therein, remain under the sole control of the contractor, or of those placed in authority by him or by his selection and direction." [177 Miss. 644, 171 So. 690.]

In the case of Regan v. Foxworth Veneer Co., supra, the Court held that a manufacturer of veneer was not the "master" of a logging woods foreman so as to be liable for the death of a member of the logging crew, resulting from the alleged negligence of the foreman, where the foreman was employed by a partnership furnishing logs to the manufacturer under a contract, which, though the general manager of the manufacturer sometimes made suggestions concerning the work, gave the manufacturer no right to exercise any control over the manner and means of doing the work.

In discussing the application of the Workmen's Compensation statutes to an "independent contractor" in 58 Am. Jur. p. 669, the text writer says: "In the great majority of cases involving the question whether a person was an employee or an independent contractor, under workmen's compensation statutes, the courts have applied the ordinary common-law tests, such as are applied in actions of tort."

In the case that we now have before us the evidence does not disclose the exercise of any control by Crabtree over the physical conduct of the Carr brothers and their employees in the performance of their contract, or over the employment and discharge of their employees. It is manifest from the evidence that the contract was not intended to create the relation of master and servant, but to constitute Carr Brothers an independent contractor.

And, when tested by the rules laid down in the above mentioned cases, the evidence shows that the Carr brothers were independent contractors. According to the testimony of Crabtree and Martin Carr, the Carr brothers were logging contractors who had been engaged in the business for several years. The contract which they had made with Crabtree, and which they were engaged in performing at the time of the accident in which John Henry Carr was killed, was a contract definite in its terms for the cutting and hauling of all the timber twelve inches in diameter and above, except hickory, on the tract of land known as the Thompson tract; and for their services the Carr brothers were to receive a fixed price of $11.50 per thousand feet log scale for all logs cut and delivered at Crabtree's mill. The Carr brothers employed assistants to help them carry out their contract and supervise their activities. They furnished their own trucks, teams, saws, axes, and other equipment necessary for the proper performance of the contract, and they purchased their own supplies of gas, oil and repair parts, as needed. They paid their own workmen. They regulated their own time for going to work and for quitting. They financed their own timber cutting and logging operations. The physical management of the instrumentalities used, and the physical conduct of the workmen employed by them in the execution of their contract remained under their control. Crabtree was interested only in the over-all result of their work. These facts, under the cases cited above, show that the relationship of the deceased to Crabtree at the time of the fatal injury

was that of an independent contractor engaged in the performance of his contract and not an employee of Crabtree.

But, it is said that under the terms of their agreement with Crabtree the Carr brothers were to cut logs fast enough and in sufficient quantities to enable Crabtree to operate his mill at its maximum capacity, and that at one time Crabtree had to put his own truck and his own crew into the woods to cut and to haul logs that the mill might continue to operate, and that Crabtree's action in doing so showed that he exercised control over Carr Brothers' operations. It is not necessary for us to determine whether Crabtree, under the circumstances existing at that time, would have had a right to put his own truck and crew into the woods to cut and haul logs if Carr Brothers had objected to him doing so, or whether Crabtree would have been liable to Carr Brothers for damages for loss of profits on account of such action, if such action had been taken without Carr Brothers' consent. ▮▮▮ In the absence of any proof to the contrary, however, it is reasonable to assume that Crabtree's action in putting his truck and crew into the woods to cut and haul logs for a few days was taken with Carr Brothers' consent or acquiescence. And in any event we do not think that Crabtree's action in the matter, whether taken with Carr Brothers' consent, or not, in view of the proof of a definite contract, has any decisive bearing upon the question as to whether Carr Brothers' relationship to Crabtree was that of a servant or an independent contractor.

Again, it is said that Crabtree furnished a truck of his own to enable the Carr brothers to carry on their logging operations, and that without the assistance thus given to them Carr Brothers would not have been able to carry out the contract which they had entered into. But we think that this contention has no merit. The fact that Carr Brothers were permitted to use Crabtree's old abandoned truck in their logging operations, after they had

had it repaired and reconditioned at their own expense, did not destroy their character as independent contractors. Johnson v. Vincennes Bridge Co., 167 La. 107, 118 So. 820.

There is no evidence in the record to justify the claim that Crabtree could have terminated the contract at will, if he had wished to do so. Martin Carr stated that he still regarded the contract as binding, and after the death of his brother he continued to carry on the logging operations under the terms of the original agreement.

The case presented by the record that we have before us is wholly unlike many cases cited by the text writers from other states in which log haulers have been held to be mere employees, even though they furnished their own teams or trucks. In most of those cases the employees worked under the direct supervision and control of the employers and might quit or be discharged at any time, and were in no real sense contractors for the doing of any specific pieces of work.

The record in this case presents no real controversy as to the facts, and we think that the circuit judge committed no error in holding that Carr Brothers' relationship to Crabtree was that of an independent contractor. The judgment of the lower court is therefore affirmed.

Affirmed.

**Hall, J.,** took no part in the decision of this case.

**Lee, J.** (separate opinion).

I concede that, under the prior decisions of this Court, so thoroughly discussed and enumerated in the opinion in this case, the weight of the evidence sustains the existence of the relationship of independent contractor, and, if those cases are to govern, the decision of the Court is correct.

However, as I understand the philosophy of the Workmen's compensation Act, its purpose was to provide

compensation "for disability or death of an employee from injury arising out of and in the course of employment, without regard to fault as to the cause of the injury * * *", subject to the two exceptions there named. Section 4, Chapter 354, Laws of 1948.

The Act makes no reference to independent contractors, and, in fact, nowhere uses that term. However, under paragraph 1, Section 3, of said Chapter, supra, the Act is made applicable to the employers therein designated that have "in service eight or more workmen or operatives regularly in the same business, *or in or about the same establishment under any contract of hire, express or implied.* * * *"

The contract here relied on was an oral one. And it is true that both Crabtree and Martin Carr, a brother of the deceased, testified to facts which would establish the relationship of independent contractor. However, at several places in his evidence Crabtree testified to the construction which he placed on several provisions of this alleged contract, which, in my opinion, negative the idea of independent contractor, and, on the contrary, indicate that he reserved the right to some control over them, and actually did so.

For instance, at one time he said: "* * * whenever he (the contractors) got behind with his logs—one time they got a pretty good piece from the mill, and I put my truck on to help them keep logs at the mill". He was asked if he had the right to go alongside the contractors and haul, and if he actually did so with his own outfit, and his reply was, "That's right". He admitted that, at the time of the accident, two of his cutters were working there in the woods, and he was paying them himself. He determined when he would pay them. He was asked, "And you, of course, would go down and see if it (the cutting) was being done the way you wanted it done", and he replied, "Yeah; walk through the woods". Again, upon being asked, "Now then, could he (the contractors) have quit this contract at any time he wanted to", his

answer was, "I don't know whether he could or not". When he was asked if he could lay the contractors off in case there were enough logs on the yard, he said, "I don't know." Later, he said on that point, "I guess that's customary * * * I reckon so." When he was asked, "Was there any time limit in this contract," he said, "No". He let the contractors have an old truck to use in logging, and when asked if they could have logged the mill without it, he said, "I don't know."

Since a liberal policy should be followed to effect the beneficent provisions of this Act, I think it would be in keeping with the philosophy of the Act to allow compensation in this case. My fear is that the door has been opened, with the result that the so-called independent contractor relationship may be given new life, and thereby exclude such contractors and their employees from the benefits of this Act.