LAUREL DAILY LEADER, INC., et al. *v.* JAMES.

No. 39686 June 13, 1955 80 So. 2d 770

*Welch & Gibbes,* Laurel, for appellant.

656

*Travis & Moore,* Jackson; *E. P. Connolly,* Laurel;
*George Maxey,* Ellisville, for appellee.

Hall, J.

Appellant, Laurel Daily Leader, Inc., publishes an afternoon newspaper, daily except Sunday, and will be hereinafter referred to as the appellant, though its Workmen's Compensation Insurance carrier is also a party to the action. The appellee at the time of his injury on September 22, 1951, was a fifteen year old newspaper carrier boy, engaged at the time in delivering and collecting for appellant's newspaper, and his injuries, which are serious and permanent, were inflicted by a passing motorist. A claim for benefits under our Workmen's Compensation Law was filed and a hearing had before the attorney-referee who found against the claim. An appeal was taken to the full commission which, by a divided vote, affirmed the action of the attorney-referee. On appeal from that decision, the circuit judge

reversed the action of the commission and found in favor of the claimant, from which decision this appeal is taken by appellant and its insurance carrier.

There is no substantial dispute as to the facts. Appellant's total circulation was between 11,000 and 12,000 papers daily. Between 9,000 and 10,000 of these papers were sold and delivered by carrier boys on and over regular routes assigned to them by appellant. No carrier was permitted to sell papers outside the route or territory assigned to him by appellant. Appellee's route was on U. S. Highway 11 South of the city of Laurel and covered a space of about four miles extending from the Pendorff School to the city limits of Ellisville. This route, along with about sixty-five others, was designated and established by appellant. About a month prior to his injury appellee learned that Joe Scoggins, the carrier on this route, was going to quit. He traveled the route with Scoggins until he learned who were the subscribers thereon, and then went to appellant's office with Scoggins and applied for the route. He was questioned by appellant's circulation manager as to his famliarity with the route and as to his means of transportation for covering the route and appellant then learned that appellee owned a motor-bike which he would use. It is a fair assumption from the evidence that a carrier on this suburban route, with so much territory to cover, could not satisfactorily work his route without some means of transportation. Appellee was instructed by appellant as to working his route, and it was particularly stressed that when he received his daily supply of papers he was to complete delivery by 6:00 o'clock p. m. In fact, the paper regularly carried a notice to its subscribers requesting them to call appellant if the paper was not received by that hour, and upon such call appellant would send a paper to the subscriber and charge it to the appellee if it raised his weekly daily average. Complaints against carriers were investigated by appellant, and if his services at any time were unsatisfactory his em-

ployment was terminated. Not only this, but appellant reserved the right to "fire" the carrier at any time.

Appellee was required to post a cash bond equal to one and one-half times the expected average weekly cost of the papers. In this case the anticipated weekly average was 140 papers at ten cents per week, or $14.00, and his deposit was $21.00. He was required to report to appellant's office every Saturday morning and pay for his week's supply of papers. He was required to collect for the papers sold at the rate of twenty cents per week. There was evidence that if the carrier had to travel to some remote place to make a delivery he could charge more than the regular price, but, since the price per week is printed in each issue, one can well imagine that a carrier boy would have to be a super-salesman to induce a customer to pay more than the published price. Appellee was requested and urged to work his territory for new subscribers and during the four or five weeks that he was employed by appellant he followed this instruction and increased his daily list by about twenty-five papers. Appellee's compensation was the difference between what he collected and what he paid for the papers, less his expense in delivering them. There was no formal written contract between the parties. Appellant delivered the appellee's daily supply of papers to him within his territory by bus at its own expense.

The publisher-manager of appellant was asked under cross-examination whether it was permissible for the delivery boys to deliver some other newspaper at the same time, and he replied that this has never come up but he'd rather they wouldn't. He was then asked if he would try to stop it, and replied "Well, I would try to reason with them, ask where they were making the most money, and tell them that's the paper they ought to handle." The reasonable conclusion from this testimony is that appellant's carrier boys would soon find themselves without a job if they should handle some other paper.

The circulation manager admitted that he supervises the work of the carrier boys. The delivery of newspapers within a reasonable time after publication is essential to the success of the newspaper business. For the greater portion of its income the paper depends on advertising, and the rates for advertising are governed by the paper's circulation. Circulation is a necessity for success. The delivery boys are just as much an integral part of the newspaper industry as are the typesetters and pressmen or the editorial staff.

Excellent briefs have been filed by counsel on both sides of this case. A great many cases have been cited from other jurisdictions; some of these hold that the carrier boys are independent contractors and some hold that they are employees within the contemplation of the Workmen's Compensation Act. We cite none of them herein for the reason that most of them can be distinguished on the facts from the case here presented. ██ █ We prefer to base our decision on our own conception of what the Legislature intended by the adoption of the compensation law in this state, as evidenced by the act itself and by what we have already held in interpreting the act and by what has been said by the text writers to the effect that the purpose of such legislation is to take the burden of accident off the shoulders of the unfortunate victim and place it upon the shoulders of industry without regard to the common-law liability of a master to his servant for injuries resulting from the master's negligence ██ █ As said by Dean Larson in Section 1.20 in his excellent book on Workmen's Compensation: "Like social insurance, but unlike tort, the right to benefits and the amount of benefits are based largely on a social theory of providing support and preventing destitution, rather than settling accounts between two individuals according to their personal deserts or blame."

In Kisner v. Jackson, 159 Miss. 424, 132 So. 90, Judge Griffith gave a scholarly discussion in a common-law

tort case as to the determining factors on the question of master and servant and independent contractor relationships, and said:

 "There are several tests to be applied, the weight of each, and whether much or little, rising and falling in the scale as it may or may not be counterbalanced by one or more of the remaining tests, present in the particular case at hand. For this reason these tests cannot be stated in any precise order of importance, but they are as follows: Whether the principal master has the right to terminate the contract at will; whether he has the power to fix the price in payment for the work, or vitally controls the manner and time of payment; whether he furnishes the means and appliances for the work; whether he has control of the premises; whether he furnishes the materials upon which the work is done and receives the output thereof, the contractor dealing with no other person in respect to the output; whether he has the right to prescribe and furnish the details of the kind and character of work to be done; whether he has the right to supervise and inspect the work during the course of the employment; whether he has the right to direct the details of the manner in which the work is to be done; whether he has the right to employ and discharge the subemployees, and to fix their compensation; and whether he is obliged to pay the wages of said employees. There are the tests, as we think. and any other, if differently stated, may be brought within one of those above briefly set out. 14 R. C. L., pp. 67-76; 31 C. J., pp. 473-475; 39 C. J., pp. 1316-1323.''

 Applying the above tests to the case at hand we find that under nearly all of them the appellee was an employee of appellant. Appellant had the power to terminate the contract at will; it had the power to fix the price — ten cents to the news carrier and twenty cents to the customer; it had control of the premises, that is to say, the entire route in and over which appellee was permitted to work; it furnished the materials, i. e.,

the newspapers on and with which the work was done; appellee dealt with no one else with respect to the output; appellant had the right to prescribe and furnish the details of the work, including the hours thereof; it had the right to supervise and inspect the work during the course of the employment; it had the right to direct the details of the manner in which the work was to be done. In short, we think that under these tests appellee was clearly an employee of appellant even under the common-law rules of negligence within the meaning and purpose of the Workmen's Compensation Act. ██ █ We have repeatedly held that the rule is more liberal in compensation cases. The members of this Court are sharply divided on the question of liability in this case, thereby indicating that the question is, at least, a close one. A majority of us are of the opinion that the appellee should have the benefit of this rule of liberality in the construction of our compensation law. We are not here concerned with a rule of liability of appellant if appellee had struck someone with his motor-bike and inflicted an injury upon a third person, and such cases as Crescent Baking Co. v. Denton, 147 Miss. 639, 112 So. 21, have no application here. Dean Larson draws the distinction in Section 43.42 of his work:

"The 'servant' concept at common law performed one main function: to delimit the scope of a master's vicarious tort liability . . . By contrast, compensation law is concerned not with injuries *by* the employee in his detailed activities, but with injuries *to* him as a result not only of his own activities (controlled by the employer as to details) but of those co-employees, independent contractors and other third persons (some controlled by the employer and others not). To this issue, the right of control of the details of his work has no such direct relation as it has to the issue of vicarious tort liability."

The argument is made that appellee was merely one of the thousands of "little merchants" scattered over the

country in the delivery of newspapers. We do not think the appellee, subject as he was to the control of appellant, can be properly classed as a little merchant so as to escape the coverage of the compensation law.

Stress is also laid on the fact that appellant did not pay social security benefits on appellee's earnings. By 42 U. S. C. A. Section 410 (a) (16) appellee was specifically exempt from social security assessments. If he had been subject to such assessment, the failure of appellant to collect and remit thereon would not afford any reason for its escape from liability in this case.

The circuit judge awarded claimant medical benefits, as provided by the act, and also total and permanent disability benefits for a period of 450 weeks, but made no allowance for temporary total disability, and appellee cross-appeals and asks that we here make an allowance for temporary total disability. According to the undisputed medical testimony appellee attained his maximum medical recovery at the expiration of two years from the date of his injury, during which time the doctor rated him as temporarily totally disabled. The cross-appeal is therefore well taken and the judgment appealed from will be amended so as to allow temporary total disability for a period of two years, plus the total and permanent benefits awarded by the judgment, not to exceed the maximum provided by the statute, and plus the allowance for medical benefits, together with interest and damages on the amount awarded by the lower court is allowed and the cause remanded so that the commission may supervise payment of the benefits due and may also in its discretion award penalties and vocational rehabilitation benefits as provided by the statute.

Modified, affirmed and remanded.

*Lee, Kyle, Arrington* and *Ethridge, JJ.,* concur.

HOLMES, J., dissenting:

I respectfully dissent from the majority view. I record my understanding of the facts and the conclusions which I have reached.

The facts related by the attorney-referee in his findings are accurately stated, and I quote the same as follows: "Barney Leon James, the claimant, was seriously and permanently injured on Saturday evening, September 22, 1951, while delivering newspapers published by the Laurel Daily Leader, Inc., and while making collections from his customers on U. S. Highway No. 11 south of Laurel, when struck by a passing motorist. At the time of the accident, James had just collected his account from one subscriber, had remounted his motorcycle, and was proceeding southwardly to the home of the next customer. James was fifteen years of age at the time. The Laurel Daily Leader, Inc., is the publisher of the Laurel Leader-Call, an evening newspaper published in the City of Laurel daily except Sunday. James was a regular carrier of the newspaper and had been for about four weeks.

"James' route or territory extended from the Pendorf community south of Laurel southwardly along U. S. Highway No. 11 to the northern boundary of the Town of Ellisville. There was no east or west boundary to James' route. A boy named Scoggins had had the route before James took it over. Sometime before Saturday, August 18, 1951, Scoggins and James made arrangements between themselves for James to take over the route. James went with Scoggins several times in delivering papers to the customers to learn who they were, or where they lived. James received no compensation for this. On Saturday, August 18, 1951, James and Scoggins went into the newspaper's office and Scoggins introduced James to the circulation manager, with

whom arrangements were made for James to begin selling newspapers along Scoggins' old route.

"The circulation manager, a young man named Blackledge, required James to deposit one and one-half times his anticipated weekly account in cash, and this amounted to $21.00. This was actually a bond to assure the publishing company that it would be paid for newspapers taken by James. There was no written contract. The circulation manager told James that he should attempt to deliver the papers at approximately the same time each day and at the same hour the customers were accustomed to receiving them from Scoggins. The manager cautioned him to be courteous to the subscribers. Scoggins gave James the canvas bag which he had used with "Laurel Leader-Call" printed on the side of it, and James used the bag, although he was not required to do so.

"The carriers of this newspaper operate under what is known as the 'Little Merchant Plan' in the newspaper world. Each carrier has a designated route or territory within which he sells newspapers. Within this territory he delivers newspapers to his customers, solicits new subscribers, and sells extra copies to those who wish to buy. The carrier obtains as many newspapers as he thinks he can sell from the publishing company each day and is charged with that number. At the end of the week, he pays the publishing company ten cents each for the average number of papers delivered to him daily during the week. The carrier collects from his subscribers as and when he can. The ordinary cost to the subscriber is twenty cents per week, although the carrier is at liberty to charge and collect more, if he can, where the subscriber lives out of the way. The carrier may deliver his papers on foot, on a bicycle, by motorcycle, or however he chooses. No credit is given and no portion of the expense of delivery is borne by the publishing company when the carrier delivers by motorcycle or other mechanical means. The carrier's earnings are the difference

between what he collects from his subscribers and the cost of the newspapers, less any expense incurred in delivery and collection.

"When a customer misses his paper, it is customary for the subscriber to call the newspaper office, which immediately attempts to get in touch with the carrier. If the office is unable to contact the carrier, another newspapers is taken to the subscriber by one of the office personnel and the carrier's account is charged with the extra paper, if the extra paper will increase the average number of papers received by him during the week. There is no penalty for missing a subscriber.

"On Monday, August 20, 1951, James began selling newspapers under this plan. At first he received his papers in bulk off of the Laurel-Ellisville bus near a church. Later he arranged for the bus driver to leave them farther south at a store. James made his own arrangements with his subscribers. In one case, he arranged to leave an out-of-the-way subscriber's paper at a friend's house. In several instances he arranged to collect from certain subscribers every other week rather than once a week. On each Saturday he went into the newspaper office and paid his account. He frequently called the newspaper office by telephone and told some one there how many papers to send him in bulk.

"James used his motorcycle to deliver his papers. It was his own vehicle and he paid for the expenses of operating it out of his collections.

"The newspaper office had no record of James's subscribers. Each carrier knew his subscribers and passed this information on to his successor. The newspaper office only kept records of the number of papers taken daily by each carrier. The newspaper office had in stock carrier bags of canvas which it sold to carriers if they wished to buy. It also carried account books of a loose leaf type which it sold, and it furnished sheets for the book free of charge. There was no requirement that a carrier buy or use any of these.

"James had no account book or other record of his subscribers, and apparently kept a mental record of subscribers and their accounts. The newspaper office had no record of the accounts of James's customers. The publishing company made no deductions whatsoever from James's account with it for withholding tax, social security benefits, or for any other purpose. James testified that he sold an average of one hundred and fifty papers per day, which would mean gross receipts of $15.00 per week, if every customer paid, from which his expenses would be deducted to find the net income. There was no evidence as to the amount of these expenses.

"If James did not sell all of his newspapers, he was not permitted to return the unsold copies for credit. James had no substitute carrier, but if he had been unable to deliver his papers for any reason, he would have had to make his own arrangements for a substitute. The publishing company pays a substitute nothing, and each carrier must settle with or pay his substitute.

"Mr. Gibbons, the publisher of the newspaper, stated that he did not recall having seen James while he was a carrier. The circulation manager stated that he saw James five times in all: the Saturday he posted his bond, and the four Saturdays on which he settled his account. Neither the circulation manager nor any one else connected with the newspaper instructed James in the manner in which he should deliver the paper, that is, whether folded, whether flat, or packaged in some other manner."

The question presented for solution is whether the appellee was an employee within the provisions of the Act. The Act defines "employee" as meaning "any person, including a minor, whether lawfully or unlawfully employed, in the service of an employer under any contract of hire or apprenticeship, written or oral, express or implied." An "apprentice," according to Webster's International Dictionary, Second edition, "is one who is

bound by indentures or legal agreements to serve another person for a certain time, with a view to learning an art or trade, in consideration of instruction therein, and formerly usually of maintenance by the master.''

Manifestly the appellee was not under an apprenticeship and if he is within the provisions of the Act it must be as an employee in the service of an employer under a contract of *hire*. In my opinion, the arrangement between him and the publisher discloses none of the elements of a contract of hire. He was paid no stipulated wage, salary or commission by the publisher. He was not on the publisher's payroll. The publisher withheld no income tax because there was no wage or salary from which to withhold it. The publisher paid no social security tax for him. The sole relationship between him and the publisher was one whereby the publisher sold him such number of papers as he applied to buy, and he bought such number as he deemed sufficient to supply his customers or subscribers. If he bought more than he needed, he could sell the excess to the public generally, or if unable to dispose of the excess he sustained the loss. He did his own soliciting for subscriptions and made his own arrangement with subscribers as to how they would pay for their subscriptions, either weekly, every two weeks, or otherwise. If a subscriber failed to pay his subscription bill, it was the carrier's loss. If a subscriber lived out of the way, the carrier could charge him more for the paper. The publisher had no record of the subscribers and did not know who they were. The only record the publisher kept was as to the number of papers bought by the carrier. The carrier chose his own mode of transportation in covering his route, whether on foot, bicycle, motorbike, or otherwise, and paid his own expenses. The carrier chose his own hours of work provided he covered his route by 6 o'clock p. m. No representative of the publisher went with him on the route to direct the manner in which he delivered the papers or collected for subscriptions. There was nothing in the

arrangement between him and the publisher that gave the publisher the right, nor did the publisher attempt to exercise the right, to direct the details of his work as a carrier. The publisher could cease selling him papers at any time and the carrier could discontinue the purchase of papers at any time. He was under no obligation to continue to buy and the publisher was under no obligation to continue to sell. It was a buyer-purchaser relationship from which the only profit derived by the carrier was the difference between what he paid for the papers and what he sold them for, less his expenses. In my opinion, therefore, he was not an employee in the service of an employer under a contract of *hire* within the provisions of the Act.

Counsel for both sides have cited a number of cases from other jurisdictions involving the relationship of a newsboy or newspaper carrier with the publishing company under workmen's compensation statutes, and dealing with the question as to whether the relationship is that of independent contractor or master and servant. These cases were all controlled by the facts of the particular case. This Court has not heretofore had before it a case involving the claim of a newspaper carrier to compensation under the Mississippi Workmen's Compensation Act. However, the controlling legal principles are the same whether the claimant be a newspaper carrier or whether he belongs to some other category or class. These legal principles have been well settled by the prior decisions of this Court and we need not seek authority under the decisions of other jurisdictions. We have in numerous cases both in tort actions and in actions under the Workmen's Compensation Act set forth the tests to be applied in determining the relationship of employer and independent contractor or master and servant. Kisner v. Jackson, 159 Miss. 424, 132 So. 90; Hutchinson-Moore Lbr. Co. v. Pittman, 154 Miss. 1, 122 So. 191; Crosby Lumber & Mfg. Co., et al. v. Durham, 181 Miss. 559, 179 So. 285; McDonald v. Hall-Neely Lbr. Co.,

165 Miss. 143, 147 So. 315; Carr v. Crabtree, et al., 212 Miss. 656, 55 So. 2d 408; Sones v. Southern Lbr. Co., et al., 215 Miss. 148, 60 So. 2d 582; Simmons v. Cathey-Williford & Jones Co., (Miss.) 70 So. 2d 847.

In these cases it is held that the important tests are whether the alleged independent contractor is one who renders service in the course of an occupation representing the will of the employer only as to the result of his work and not as to the means or details by which it is accomplished, and that he is not a master who has no right to control the servant in the details of his work and who is interested alone in the ultimate result of the work as a whole and not in the details of the performance. Measured by these tests, I think that the appellee has failed to meet the burden of proof which rested upon him to establish the existence of the employer-employee relationship at the time he sustained his injury. The attorney-referee and the commission so found, and their finding, in my opinion, is supported by substantial evidence.

The appellee in his argument places much emphasis upon the fact that the arrangement between him and the publisher could be terminated at any time. The facts, however, do not present a case where the employer retains the right at any time to terminate a contract of hire. The publisher did not hire the appellee. The only power vested in the publisher under the arrangement between it and the appellee was to cease selling the appellee papers if it chose to do so. Under the prior decisions of this Court, however, it is well settled that the right to terminate even a contract of hire is not conclusive of the relationship. Crosby Lbr. & Mfg. Co., et al. v. Durham, supra; Kisner v. Jackson, supra; Simmons v. Cathey-Williford & Jones Co., supra.

The appellee also lays much stress in his argument upon what he contends to be the right of supervision over the carrier by the circulation manager. All that the proof shows with respect to the supervision, or right

of supervision over the carrier by the circulation manager, is that the circulation manager let out the routes, settled with the carriers each Saturday for the papers they had bought the past week, gave them helpful hints to improve their service to subscribers, advised them to deliver the papers to subscribers at approximately the same time every day and by six o'clock p. m., suggested that they be courteous and polite, and undertake to increase the subscriptions. All this, however, affected the ultimate result of the work, that is to say, it contributed to an increase sale of papers from which both the publisher and the carrier benefitted. It did not evidence a control over the actual activities of the carrier in covering his route on his motorbike, operating his motorbike, and in making deliveries and sales of his papers. In order to avoid the responsibilities of master, it is not necessary that the owner or employer entirely absent himself from the work, or entirely disassociate himself from an active interest, or an active aid in the course of its performance. It was so held in the case of Cook et al. v. right, 177 Miss. 644, 171 So. 686, wherein the Court said:

"It is not necessary that an owner or employer, in order to avoid the responsibility of master, shall entirely absent himself from the work, or entirely disassociate himself from an active interest, or an active aid in the course of its performance, or from a supervision of the results of that performance, so long as, in respect to the details of the work necessary, or proper, to be performed for the production of the net results required by the contract, the physical management of the instrumentalities used, and the physical conduct of those employed therein, remain under the sole control of the contractor, or of those placed in authority by him or by his selection and direction."

In the case of Regan, et al. v. Foxworth Veneer Co., 178 Miss. 654, 174 So. 48, the Court said: "The evidence for appellants, however, tended to show that two or

three times a week Taylor, appellee's vice-president and general manager, went into the woods where the logging was being done and made suggestions and gave directions as to how the work was to be carried on. Taylor admitted that to be true, but testified that it was merely by way of advice, that he had no right to control the crew in any manner, that his plant was sometimes short of logs and his purpose was to hurry up the supply. One or more witnesses testified that Taylor suggested sometimes where it would be well to place the skidder, and his suggestions were followed. There was not a bit of evidence tending to show that under the contract Taylor had the right to exercise any control whatsoever over the manner and means of doing the work. The crew was bound to know from all the facts and circumstances that Ball Brothers was their master and not Taylor.

Pertinent to the existence of the employer-employee relationship is the case of Simmons v. Cathey-Williford & Jones Company, supra, wherein the Court found the facts to be as follows: ''Cathey was a lumber manufacturer. It bought timber and had the logs cut and hauled to its Grenada plant. Some of the logs were placed upon railroad property for loading on railroad cars for shipment to Grenada. At some such places, Cathey rented the land where the logs were placed for loading. The loading of such logs was a necessary part of Cathey's operation. Cathey entered into a verbal contract with Norman Wilson to load such logs owned by Cathey and placed on various points on the railroad for shipment to its plant. Wilson was paid $12.50 for each car loaded. Wilson was to furnish the logger's dream used in loading the logs, which machine was owned by a third party to whom no rent was paid by Wilson. Wilson furnished all operating expense and repairs of the logger's dream. Wilson paid his own labor, consisting of appellant and one other. Wilson had the sole right to hire and discharge appellant and the other laborer,

and to hire whom he pleased. He paid such laborers such sums as he saw fit. Wilson and his laborers started and stopped work as Wilson determined. Wilson was told by Reed, Cathey's assistant manager, where logs were to be loaded. Reed ordered the cars for loading and then notified Wilson to load them. Reed went to the loading operation about once a week. Cathey did not, and had no right to, give orders as to the details of the loading operations. Wilson was paid weekly; he cashed his check and paid his laborers weekly. The contract was for no specified time and the parties understood it could be terminated at any time by either party. Reed scaled the logs to be loaded and sometimes Wilson would help him, but Wilson was not paid for this service. Neither Wilson nor his laborers were carried on the payrolls of Cathey. Appellant had been hired by Wilson at $7.00 per day to help in the loading operations, and was injured while so engaged. Wilson also loaded logs for Gooch Lumber Company who was the owner of the logger's dream, the only appliance used in Wilson's operation.''

In denying the claim for compensation, the Court said: ''After careful study of the facts and consideration of the decisions of this Court on the question before us, we are of the opinion that Wilson was an independent contractor. Carr v. Crabree, et al., 212 Miss. 656, 55 So. 2d 408. Since the Carr case cites the cases binding on this Court on the issue before us, it would serve no purpose to again examine these authorities. We do, however, refer to Crosby v. Durham, 181 Miss. 559, 179 So. 285, wherein it was held that the right to terminate the contract at the employer's will is not determinative of the relationship, but is a fact for consideration in determining whether one is an employee or an independent contractor.''

Very analogous to the case at bar is the case of Crescent Baking Co. v. Denton, 147 Miss. 639, 112 So. 21. The baking company operated a bakery. It sold bread which was delivered to customers living outside of the

City of Clarksdale and neighboring towns and points along the way. The baking company had several routes upon which its bread was sold in that territory. These routes were prescribed by the baking company and let out to different persons who would buy bread from the baking company and deliver it to their customers along the route. A man named Pinkston operated an auto-truck on one of the routes and bought bread from the baking company in the morning and sold and delivered it to customers living along the route, and would collect from his customers and for convenience, would deposit his collections with the baking company when he returned at night. He was required to deposit $100 as security when he took the route. He bought the bread from the baking company and then sold it. At the end of the week he settled with the bakery for all bread that he had bought. All bread that he bought and did not sell was a loss to him. His profits were increased or decreased in accordance with the amount of bread he sold. Pinkston furnished his own truck and operated it along the route in such way and manner as he saw fit. The baking company had no control over Pinkston in the operation of his truck, except that Pinkston operated the truck and sold bread to customers only along a certain designated route which the baking company had assigned to him. The baking company had no connection with the sale of the bread except to prescribe the particular route upon which Pinkston was to sell it. The baking company did not hire Pinkston, nor could it discharge him for any reason. The only thing it had power to do with reference to the employment of Pinkston was that it could refuse to sell him bread if it decided to do so. The Court said, in holding that Pinkston was not an employee, that "the most that could be said was that the baking company was only interested in the results as to the sale of the bread and not in the means or method of obtaining the results." Pinkston was held to be an independent bread dealer and the baking company

was held not to be liable for his acts in an action by a third party against the baking company for the alleged negligence of Pinkston in the operation of his truck resulting in the killing of a child.

There is no difference in the relationship between Pinkston and the baking company and that between the appellee and the publisher in the case at bar. The only difference is the commodity in which the respective parties dealt. Pinkston was buying bread, whereas the appellee in the case at bar was buying newspapers. The baking company had no control over Pinkston in the operation of his truck along his assigned route. Likewise, in the case at bar, there is absolutely no proof that the publisher had the right of control or exercised control over the appellee in the operation of his motorbike along the route. The Court held the baking company not liable to a third party for the negligent act of Pinkston in the operation of his truck. If the case now before us were a tort action instituted by a third party against the publisher for injuries inflicted by the appellee in the negligent operation of his motorbike, this Court would be faced with either following the Crescent Baking Company case or overruling it. I think that the Court would unhesitatingly refuse to overrule the Crescent Baking Company case.

Thus the anomalous situation is presented that if the appellee injured a third party in the negligent operation of his motorbike, he would be an independent contractor and the publisher would not be liable under the ruling in the Crescent Baking Company case, whereas if the appellee injured himself in the same accident and filed a claim for compensation under the Workmen's Compensation Act, he would, under the majority holding, be held to be an employee. In other words, he is not an employee if his act involves injury to a third person, but he is an employee if his act involves injury to himself. However versatile the carrier may be, I do not think that he could successfully play this double role.

The majority opinion would brush aside as inapplicable the Crescent Baking Company case. I do not think it can be so lightly disposed of. There is no dispute about the facts in this case. The appellee was either an employee or he was not an employee under the decisions of this court both in tort actions and in actions under the Workmen's Compensation Act. As was held in Simmons v. Cathey-Williford & Jones Co., supra, the prior decisions of this Court are binding upon the Court. I am not unmindful of the fact, as pointed out in the majority opinion, that in determining whether the relationship of employer and employee exists a more liberal rule is to be applied under the Workmen's Compensation Act than in negligence cases. The rule of liberality, however, should apply to the provisions of the Act and not to the determination of the relationship where the facts of such relationship are undisputed.

There is no room for the application of liberality in the construction of our Workmen's Compensation Act in its definition of an "employee." The terms of the Act defining an "employee" are plain and unambiguous. In order to be an employee, he must be one in the service of an employer under a contract of hire. He was not hired, just as this Court ruled in the Crescent Baking Company case that Pinkston was not hired. The majority opinion ignores the plain provisions of the Act defining an employee. I think that we are bound by the definition of an employee as set forth in the Act and by the prior decisions of this Court setting forth the tests in determining whether an employer-employee relationship or independent contractor relationship exists. The Act confines an employee other than one under an apprenticeship to one rendering service to another under a contract of hire. If the Act is to be broadened so as to include other claimants not now within the provisions of the act, then that is a legislative function.

I think we can not safely ignore the established tests and principles which we have announced in the prior de-

cisions of this Court. With deference, I think that the decision of the majority is a departure from these established tests and principles. The Hon. Roscoe Pound, in an address before the Eighth Annual Law Institute in Jackson, Mississippi, aptly said:

"I have no sympathy with those who would reject stare decisis entirely and have every case decided solely on its own facts, rejecting general rules, principles as authoritative starting points for legal reasoning applied to given states of fact, and general doctrines. We must distinguish deep-seated doctrines which affect much more than a precise point or involve a general principle or starting point for reasoning in many types of cases so that if abrogated for the exigencies of one case they may upset the law at many points and lead to results which may not be predicted. In such cases there ought to be legislation to make the adjustment and prevent litigation for an indefinite future till the situation can be untangled judicially as cases arise."

It is my view, stated with deference, that the facts of this case fail to disclose an employer-employee relationship, and that the judgment of the court below should be reversed and judgment rendered here for appellants.

*McGehee, C. J.,* and *Roberds* and *Gillespie, JJ.,* join in this dissent.

ROBERDS, J., Special Opinion:

I join in the dissent for these reasons: First, as shown by the several cases cited in the dissenting opinion, we have committed ourselves to the proposition that the tests for determining whether one is an employee or an independent contractor are those applicable under the common law, and that is true as to compensation claims as well as vicarious tort actions by third persons.

Second, under Crescent Baking Co. v. Denton, 147 Miss. 639, 112 So. 21, and Simmons v. Cathey-Williford & Jones Co., 220 Miss. 389, 70 So. 2d 847, and other cases cited in the minority opinion, the facts of this case do

not establish the relation of master and servant between The Laurel Daily Leader, Inc., and James.

Third, the able majority opinion suggests that in an effort to establish the relation between the parties, we should apply to compensation cases rules different from those applicable to master and servant cases as we have announced them in the reported cases. I, too, think the degree of proof necessary to establish a compensation claim should be less than that essential to establish tort liability to a third person injured by the act of a servant. Larson has a splendid discussion in support of this idea. Larson's Workmen's Compensation Law (I), pages 630 to 636. But I don't think it is the function of this Court to assume to define the elements essential to establish the employee compensation relation as distinguished from the common law master and servant relation. That should be done by the legislature. That tribunal has already defined the term "employee" in the Compensation Act. We have held that this relation is to be established under common law rules. We must either follow, depart from or overrule those decisions to uphold the claim here, which action, as well as our inability to define the factors and elements essential to establish the master and servant relation under the Compensation Act, as distinguished from the common law, must of necessity bring about great uncertainty and confusion. The State of Wisconsin met the situation by definition through legislative enactment. Wis. Stats. Sec. 102.07 (8).

GILLESPIE, J., special opinion:

I am fully in accord with the dissenting opinion of Justice Holmes. With deference, I think the majority has accomplished two things: (1) Overruled, without saying so, a long line of decisions of this Court, and (2) established the relationship of employer and employee between the appellant and appellee by judicial fiat, thereby performing a legislative function. The dissenting opinion of Justice Holmes, it seems to me, has clearly

established the stated premises. I will not seek to establish the premises; I think they are self-evidence upon a reading of the cases cited in Justice Holmes' dissent and the Workmen's Compensation Act. Therefore, what I say here assumes the premises stated.

The power of this Court to overrule past decisions is not to be questioned, but that power should be exercised only for the most compelling reasons. The doctrine of stare decisis is the bedrock of our system of jurisprudence. It has given direction and stability to the common law whose precepts constitute the larger part of the rules by which we live and are governed. It demands definiteness in the law, and that its rules be consistent so that they may be known. It has been said to be the most fundamental characteristic of the common law as distinguished from other systems. The failure to follow precedent has a tendency to unsettle the law, not only on the point at issue, but at many points where the changed rule is intertwined with, or forms the basic support of, other rules. There are many interdependent parts in the structure of the law, and the validity of countless rules depend, by analogy, on other rules. Such is the case here involved.

The rule of stare decisis is not completely immutable, but is flexible enough to admit of change under certain limited circumstances; but this flexibility extends only to circumstances where the previous rule of law would perpetuate error and wrong would result if the decisions were followed. Nor can it be said that the doctrine of stare decisis is inconsistent with the expansive and progressive characteristics of the common law whereby it adapts itself to new relations and interest which are constantly springing up in the progress of society; for this progress must be by analogy to what is already settled. Thus it is that through centuries of development of the law in England and this country its true progress has been consistent with the rule of stare decisis, and the progressive characteristics of our law should not be con-

fused with capricious change. Nothing has recently happened in industry or society in general that justifies us in changing the fundamental rules that determine the circumstances under which the relationshp of employer and employee is established. I am not as much concerned with the rule laid down by the majority as it affects the particular relationship here involved as I am in the integrity of the rule of star decisis itself; nor does the fact that the Court overrules former cases without saying so, as I think the majority has done, lessen the effect of the decision as a threat to the stability and harmony that has so long been the foundation of our system of law.

On the second stated premise, that the Court has accomplished a legislative function, I am equally concerned. The principle function of the constitution is to divide the powers between the three branches of government. No one would even suggest that this Court has the power to legislate, and no one has so suggested. The court happens to have the power to determine the limits of the power of each branch, and thereby is vested with the power to determine its own power. This could be the Achilles' heel of our constitutional form of government; although it is not suggested that this case reaches any such proportions, but the statement is made to emphasize the grave responsibility of the courts, the judges of which are human beings and therefore inherently capable of error in common with all men, to guard jealously against the natural tendency to assume power they do not rightfully have. We can, if we would, destroy an established rule of law by judicial whim; or destroy a statute by interpretation; and by the same method alter the organic law of the State. I dissent in this case because I firmly believe that the Court has extended the Act to an area not even contemplated by the legislature. I do not argue the question of whether it would be best to cover newspaper carriers by the Act. I do say that it is a matter for determination by the

legislature, not the courts. The only practical restraint against the usurpation of power by the courts is the dedication of those who happen to be its organs to faithfully refrain from exceeding the bounds of judicial authority.

Aside from what is said above, I desire to show what I think is one of the worst features of judicial legislation. There are hundreds, if not thousands, of boys carrying newspapers in this State. These boys are learning something of business; they are learning self-reliance; they are developing the ability to meet and deal with people; they are observing that there are people who are kind and considerate, and those who are not; they are learning to earn and handle money; they are gaining experience that will make them more useful citizens of the future; they are in many cases contributing substantially to the support of themselves and families; they are learning many lessons that cannot be valued in money or expressed in words. The newspaper boy is a familiar and storied part of the American scene. Now that the Court has held him to be an employee instead of a merchant on his own, there is the question of liability insurance, deductions for social security and other such things, and, of course, the necessity that they be considered in determining premiums on the newspaper's workmen's compensation policies, possibly even minimum wages under the Federal law. All this will add to the costs of delivering the papers. I do not profess to know what will be the result, but I apprehend that the situation is likely to become so complicated and involved that the newspaper publishers may abandon the time-honored method of delivery by paper boys and employ other, and possibly less expensive, methods of delivering newspapers. I am unable to find justification for assuming the responsibility of so far-reaching a change affecting so many boys. Nor am I willing to say that the benefits that this appellee, and a few others who may be injured, may receive, would justify the ulti-

mate effect of the decision. These are matters that the legislature, through hearing or other means, could determine and intelligently weigh as a part of its duty and responsibility in such matters. It is not one for the courts. We do not have the information necessary for a wise and proper decision.

For these added reasons, I record my dissent.